**Slip Op. 99-25**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

KOENIG & BAUER-ALBERT AG, ET AL.,

        Plaintiff,

    v.

UNITED STATES,

        Defendant,

    and

GOSS GRAPHICS, INC.

        Defendant-Intervenor.

</td><td>

BEFORE: Pogue, Judge

Consol. Court No. 96-10-02298

(Germany)

</td></tr>
</table>

[Final results of Commerce's redetermination sustained in part and remanded in part.]

Decided: March 16, 1999

Shearman & Sterling (Thomas B. Wilner, Jeffrey M. Winton, Michael J. Chapman, and Meredith Kolsky Lewis) for Plaintiffs MAN Roland Druckmaschinen AG and MAN Roland Inc.; Kirkland & Ellis (Kenneth G. Weigel, Carol A. Rafferty, Nancy Kao) for Plaintiffs Koenig & Bauer-Albert AG and KBA-Motter Corp.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Boguslawa B. Thoemmes, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, and Randi Rimerman Serota, Attorney, Department of Justice, Civil Division, Commercial Litigation Branch, for Defendants.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, Willis S. Martyn III, and Leslie Johnson Pujo) for Defendant-Intervenor.

## OPINION

**POGUE, Judge:** On June 23, 1998, this Court remanded certain aspects of the Department of Commerce's ("Commerce") determination

in <u>Large Newspaper Printing Presses and Components Thereof, Whether</u> <u>Assembled or Unassembled, From Germany</u>, 61 Fed. Reg. 38,166 (Dep't Commerce, July 23, 1996)(final determination)("<u>Germany Final</u>"). See <u>Koeniq & Bauer-Albert AG v. United States</u>, 22 CIT ___, 15 F. Supp.2d 834 (1998).[1]  Specifically, the Court directed Commerce: 1) to reconsider the decision not to combine MAN Roland's large newspaper printing press ("LNPP") production costs with those incurred by its subsidiary, MAN Plamag, and 2) to recalculate MAN Roland's selling, general, and administrative costs using an appropriate allocation ratio.  <u>See id.</u> at ___, 15 F. Supp.2d at 858.

### Standard of Review

The Court will uphold a Commerce determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i)(1994).

### I.    Combining MAN Roland and MAN Plamag Production Costs

#### A.    Background

Where certain criteria are met, Commerce "collapses" related

---

[1]In that decision, Plaintiffs Koenig & Bauer-Albert AG ("KBA") and MAN Roland Druckmaschinen AG and MAN Roland Inc. ("MAN Roland"), respondents in the underlying investigation, and Plaintiff Goss Graphic Systems, Inc. ("Goss"), petitioner in the underlying investigation, filed separate motions challenging various aspects of Commerce's determination.  The motions were consolidated.

companies into one entity, deriving a single, weighted-average dumping margin for the collapsed entity as a whole. See Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT ___, ___, 6 F. Supp.2d 865, 893 (1998). Here, during the underlying administrative proceedings, MAN Roland argued that, because MAN Roland and its wholly owned subsidiary, MAN Plamag, met the criteria for collapsing, Commerce "should [have] average[d] the labor and overhead rates of both the MAN Plamag and [MAN Roland] facilities because LNPPs [were] produced at both locations." Germany Final at 38,187.

In its final determination, Commerce neither outlined its collapsing practice nor explained why MAN Roland and MAN Plamag did not meet the requisite criteria. See id. at 38,188. Instead, without addressing the fact that both companies produced LNPPs, Commerce stated that "MAN Plamag is an affiliated party to [MAN Roland] . . . [that] supplies [MAN Roland] with one of the major production inputs[.]" Id. Commerce concluded, "[c]ontrary to [MAN Roland's] assertion, the Department's normal practice is not to automatically collapse affiliated suppliers and the respondent company." Id. In its brief, the government argued that it did not average MAN Roland's and MAN Plamag's costs because MAN Plamag was not a producer of identical merchandise. See Koenig & Bauer-Albert, 22 CIT at ___, 15 F. Supp.2d at 849, n. 7.

This Court found Commerce's response in its final determination to be insufficient. See id. at 849. Moreover, because Commerce's "identical merchandise" argument was a post hoc

rationalization, the Court did not address it on the merits.  See id. at 849, n.7.   Therefore, the Court remanded the issue for Commerce to reconsider.  See id. at 850.  The Court also instructed Commerce that, if it chose to rely on the "identical merchandise" argument, it would have to reconcile its determination with Certain Fresh Cut Flowers From Colombia, 55 Fed. Reg. 20,491, 20,497 (Dep't Commerce, May 17, 1990)(final determination)("Fresh Flowers") and Silicon Metal From Brazil, 59 Fed. Reg. 42,806, 42,808 (Dep't Commerce, Aug. 19, 1994)(final determination)("Silicon Metal").[2] See id. at 849, n.7.

In its redetermination, Commerce reconsidered the issue, but again decided not to combine the costs of MAN Roland and MAN Plamag for purposes of calculating the cost of production.  See Final Results of Redetermination Pursuant to Remand (Dep't Commerce, Sept. 17, 1998)("Redetermination") at 3.  Commerce maintained that, pursuant to its "established practice," it only averages a company's production costs from multiple facilities where the facilities actually produce identical merchandise.  Id. (citing Open-End Spun Rayon Shingles Yarn From Austria, 62 Fed. Reg. 43,701, 43,703 (Dep't Commerce, Aug. 15, 1997)(final determination); Canned Pineapple Fruit From Thailand, 62 Fed. Reg.

---

[2]In Certain Fresh Cut Flowers From Colombia, Commerce averaged the costs of two related companies it collapsed even though it found that the flowers produced by the two farms were "somewhat different[.]"  Fresh Flowers at 20,497.  In Silicon Metal From Brazil, Commerce averaged a company's costs incurred at different furnaces in part because "other furnaces used to produce non-subject merchandise [could] be used to produce silicon metal."  Silicon Metal at 42,808.

42,487, 42,491 (Dep't Commerce, Aug. 7, 1997)(preliminary results of admin. review); <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France</u>, 61 Fed. Reg. 66,472, 66,477 (Dep't Commerce, Dec. 17, 1996)(final results of admin. review)).   In addition, Commerce argued that its decision in <u>Germany Final</u> was consistent with <u>Fresh Flowers</u> and <u>Silicon Metal</u>. <u>See id.</u> at 5,6.

Finally, Commerce addressed the policy argument advanced by MAN Roland as support for MAN Roland's position.  In its comments to Commerce's redetermination, MAN Roland argued that Commerce's practice of averaging a respondent's production costs incurred at multiple facilities was designed "to avoid an opportunity for a respondent to escape dumping liability . . . simply because of the choice of the facility in which the merchandise was produced." Cmts. of MAN Roland on Redeterm. Pursuant to Remand ("MAN Roland Cmts.") at 7.  In other words, according to MAN Roland, Commerce's practice is to average a respondent's production costs incurred at multiple facilities where the various facilities have the <u>capability</u> to produce the subject merchandise.

Countering MAN Roland's assertion, Commerce stated,

> We disagree with [MAN Roland's] argument that, where a respondent has the <u>ability</u> to produce the subject merchandise at more than one facility, the reported costs should reflect the weighted-average cost of manufacturing at all facilities. Contrary to [MAN Roland's] assertion, the Department does not weight-average the production costs incurred for non-identical merchandise simply because the respondent <u>could</u> have produced identical merchandise at one of its facilities.

Redetermination at 8.

**B.  Discussion**

In its redetermination, Commerce maintained that it properly did not average MAN Roland's and MAN Plamag's production costs because, under its "established practice," Commerce only averages a company's production costs from multiple facilities where the facilities produce <u>identical</u> merchandise.  <u>See</u> Redetermination at 3.  The Court here reviews whether in fact Commerce's identical merchandise requirement constitutes its established practice in the context of affiliated parties.

The Court first concludes that Commerce has failed to explain how its identical merchandise practice is consistent with its decisions in <u>Fresh Flowers</u> and <u>Silicon Metal</u>.

In <u>Fresh Flowers</u>, Commerce weight-averaged the production costs of two related companies, Floramerica and Cultivos de Caribe, that were collapsed for purposes of calculating constructed value. <u>See</u> <u>Fresh Flowers</u> at 20,497.  The Floramerica farm produced standard chrysanthemums, while the Cultivos de Caribe farm produced spider chrysanthemums.  <u>See id.</u>  In its redetermination, Commerce contended that it averaged the two farms' production costs because Commerce regarded the two chrysanthemum varieties "as part of the identical product category, chrysanthemums[.]"  Redetermination at 5.

Commerce's position here is not consistent with the reasoning articulated in <u>Fresh Flowers</u>.  There, Commerce explained, "[a]lthough the flowers are somewhat different, we consider spider chrysanthemums and standard chrysanthemums to be the same type and

therefore calculated one [constructed value] for both." Fresh
Flowers at 20,497. The Court fails to see how the phrases
"somewhat different" and "the same type" can be reconciled with
"identical." Moreover, if, quoting Commerce, it is sufficient for
the purpose of cost averaging that the products produced at each
facility be "part of the identical product category," Commerce has
not explained how different models of LNPPs are not members of an
identical product category, LNPPs.

Similarly, Commerce failed to explain how its decision in
Germany Final is consistent with Silicon Metal. In that
determination, Commerce averaged a silicon metal producer's costs
incurred by different furnaces. See Silicon Metal at 42,808. In
its redetermination, Commerce asserted that Silicon Metal did not
"support . . . [MAN Roland's] contention that the Department
normally computes a weighted-average cost for merchandise that is
non-identical . . . [because there the respondent] produced the
identical merchandise in multiple furnaces during the period of
review." Redetermination at 9.

While Commerce is correct that all the furnaces in question in
Silicon Metal produced the subject merchandise during the period of
review, see Silicon Metal at 42,808, Commerce's characterization of
that determination ignores its stated rationale. In Silicon Metal,
Commerce indicated that it averaged production costs incurred at
multiple facilities to prevent the respondent from being able to
avoid dumping liability through the manipulation of production:

The Department believes that it is inappropriate to

> specifically identify inputs obtained at a lower cost to a particular product or production run. The furnaces used to produce silicon metal can produce other products that are not subject to review. Likewise, other furnaces used to produce non-subject merchandise <u>can</u> be used to produce silicon metal. Accordingly, any benefits derived from the use of a particular furnace relate to all products produced during the period of review.

<u>Id.</u> (emphasis added). Therefore, contrary to Commerce's assertion, the decision in <u>Silicon Metal</u> did not require that the multiple facilities actually produce identical merchandise; rather, the decision was based on the <u>ability</u> to produce the subject merchandise at more than one facility.

Moreover, Commerce has failed to demonstrate that its identical merchandise requirement is its established practice in the context of affiliated parties. First, the determinations Commerce cited as support for its assertion were all made <u>after</u> its decision in <u>Germany Final</u>. <u>See</u> Redetermination at 3 (citing <u>Open-End Spun Rayon Singles Yarn From Austria</u>, 62 Fed. Reg. 43,701, 43,703 (Dep't Commerce, Aug. 15, 1997)(final determination); <u>Canned Pineapple Fruit From Thailand</u>, 62 Fed. Reg. 42,487, 42,491 (Dep't Commerce, Aug. 7, 1997)(preliminary results of admin. review); <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France</u>, 61 Fed. Reg. 66,472, 66,497 (Dep't Commerce, Dec. 17, 1996)(final results of admin. review)). Therefore, Commerce cannot rely on these decisions as support for its assertion that its identical merchandise requirement was its established practice prior to its determination in <u>Germany Final</u>. Moreover, none of Commerce's cites specifically addresses the

question at issue here: whether Commerce only averages the
production costs incurred by affiliated parties at multiple
facilities where the facilities produce identical merchandise
during the period of review.[3]

Upon review of Commerce determinations, it is apparent that
Commerce does have a multiple facility cost averaging practice

_____

[3]The issue in the Austrian Yarn case was whether, for
purposes of the difference in U.S. and home market merchandise
adjustment under 19 U.S.C. § 1677b(a)(6)(C)(ii), the respondent
should report "a different cost of manufacturing for identical
yarns due to the fact that different machines produce the yarn."
Open-End Spun Rayon Singles Yarn From Austria, 62 Fed. Reg.
43,701, 43,703 (Dep't Commerce, Aug. 15, 1997)(final
determination).  Commerce decided to calculate a single weighted-
average cost of manufacturing for the identical yarns because
"the difference in merchandise adjustment is intended to account
for physical differences in similar merchandise being compared
and not differences in the production process[.]"  Id. (emphasis
added).  The difference in merchandise adjustment is not relevant
to the issue before the Court.
The Thai Pineapple decision Commerce cited was a preliminary
determination that simply stated that Commerce "calculated a
single weighted-average cost for products with identical physical
characteristics[,]" without any indication of the context or the
issue.  Canned Pineapple Fruit From Thailand, 62 Fed. Reg.
42,487, 42,491 (Dep't Commerce, Aug. 7, 1997)(preliminary results
of admin. review).  Upon review of the matter's final
determination, however, it is apparent that the issue addressed
was not whether the costs at separate facilities should be
averaged, but whether Commerce should calculate one average cost
for the entire review period or separate costs for each fiscal
year.  See Canned Pineapple Fruit From Thailand, 63 Fed. Reg.
7,392, 7,399 (Dep't Commerce, Feb. 13, 1998)(final results of
admin. review).
Finally, in Antifriction Bearings, Commerce decided that the
respondent appropriately reported the production costs of a
related party.  See Antifriction Bearings (Other Than Tapered
Roller Bearings) and Parts Thereof From France, 61 Fed. Reg.
66,472, 66,497 (Dep't Commerce, Dec. 17, 1996)(final results of
admin. review).  There was, however, no discussion of the degree
of the parties' affiliation and no indication that the parties'
merchandise needed to be identical.  See id.  Therefore, the
determination does not help resolve the issue before this Court.

where the respondent is a single entity.  See, e.g., Steel Wire Rod From Venezuela, 63 Fed. Reg. 8,948, 8,952 (Dep't Commerce, Feb. 23, 1998)(suspension of investigation)("Weighted-average costs are used for a product that is produced at more than one facility . . . based on the cost at each facility."); Certain Cut-to-Length Carbon Plate From South Africa, 62 Fed. Reg. 61,751, 61,754 (Dep't Commerce, Nov. 19, 1997)(suspension of investigation); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Italy, 60 Fed. Reg. 10,959, 10,962 (Dep't Commerce, Feb. 28, 1995)(final results of admin. review).  None of these determinations indicates, however, that the products manufactured at multiple facilities must be identical as a prerequisite to the weight-averaging of production costs.

Moreover, no authority discusses whether or not to average the production costs incurred by affiliated producers at multiple facilities.  The only context in which such discussion does occur is in the context of collapsing.  See, e.g., Fresh Flowers at 20,497.

As noted in this Court's original decision, Commerce was not completely responsive to MAN Roland's underlying argument at the administrative level.  See Koenig & Bauer-Albert, 22 CIT at ___, 15 F. Supp.2d at 849.  There, MAN Roland argued that MAN Roland's and MAN Plamag's production costs should have been averaged because the two affiliated companies met Commerce's criteria for collapsing. See Germany Final at 38,187.  Where Commerce collapses two affiliated companies, it calculates a single weighted-average

dumping margin for the companies as a whole.  See Asociacion, 22 CIT at ____, 6 F. Supp.2d at 893.  In Germany Final, Commerce described MAN Roland and MAN Plamag as affiliated parties, yet did not address whether the two companies should have been collapsed.  See Germany Final at 38,188.  Instead, Commerce merely stated that "the Department's normal practice is not to automatically collapse affiliated suppliers and the respondent company."  Id.

This Court has previously held that Commerce has the authority to collapse multiple parties and treat them as a single entity.  See Queen's Flowers de Colombia v. United States, 21 CIT ___, ___, 981 F. Supp. 617, 622 (1997).[4]  Just prior to the issuance of Germany Final, Commerce outlined its criteria for collapsing as follows:

> In determining whether to collapse related or affiliated companies, the Department must decide whether the affiliated companies are sufficiently intertwined as to permit the possibility of price manipulation.  In making this decision, the Department considers factors such as: (1) The level of common ownership; (2) interlocking boards of directors; (3) the existence of production facilities for similar or identical products that would not require retooling either plant's facilities to implement a decision to restructure either company's manufacturing priorities; and (4) whether the operations of the companies are intertwined as evidenced by coordination in pricing decisions, shared employees or transactions between the companies.

---

[4]The Court's decision in Queen's Flowers addressed Commerce's practice under the antidumping law as it existed prior to the implementation of the Uruguay Round Agreements Act ("URAA"), which became effective on January 1, 1995.  Commerce decided Germany Final under the current law as amended by the URAA.  See Germany Final at 38,166.  This court has recently upheld Commerce's collapsing practice as consistent with the URAA.  See AK Steel Corp. v. United States, 22 CIT ___, ___, slip op. 98-159 at 22-23 (Dec. 22, 1998).

Certain Pasta From Italy, 61 Fed. Reg. 30,326, 30,351 (Dep't Commerce, June 14, 1996)(final determination)(emphasis added). See also, Certain Hot-Rolled Carbon Steel Flat Products From Canada, 58 Fed. Reg. 37,099, 37,107 (Dep't Commerce, July 9, 1993)(final determination); Certain Granite Products From Spain, 53 Fed. Reg. 24,335, 24,337 (Dep't Commerce, June 28, 1988)(final determination).

In particular, the Court notes the third criterion, which indicates that, in determining whether to collapse, Commerce considers the existence of production facilities for similar or identical products that afford the company the ability to manipulate its manufacturing priorities. Indeed, in the context of collapsing, this criterion contradicts Commerce's assertion that it will only average a respondent's production costs incurred at multiple facilities where the facilities produce identical products. See Redetermination at 3. Moreover, it undermines Commerce's assertion that "the Department does not weight-average the production costs incurred for non-identical merchandise simply because the respondent could have produced identical merchandise at one of its facilities." Redetermination at 8. To the contrary, whether a collapsed entity has the ability to evade the antidumping law through the manipulation of production is central to the question of whether to collapse the related entities in the first place. See Queen's Flowers, 21 CIT at ____, 981 F. Supp. at 622 (holding that Commerce has statutory authority "to treat a related exporter and importer as a single entity in order to prevent price

or production manipulation.").

In establishing regulations to conform with the URAA, Commerce codified its collapsing practice. See Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,330 (Dep't Commerce, Feb. 27, 1996)(proposed rules). The new regulation states,

> (f) *Treatment of affiliated producers in antidumping proceedings*--(1) *In general*. In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity <u>where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.</u>
>
> (2) *Significant potential for manipulation*. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:
>
> (i) The level of common ownership;
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(1998)(emphasis added).

Although the collapsing regulation was not promulgated until May 19, 1997, it had already been proposed on February 27, 1996, and had been relied upon by Commerce as instructive and consistent with Commerce's practice and policy before its effective date. See, e.g., Gray Portland Cement and Clinker From Mexico, 62 Fed. Reg. 47,626 (Dep't Commerce, Sept. 10, 1997)(preliminary results of admin. review)(stating that, although the proceeding was not

governed by the new regulations, 19 C.F.R. § 351.401(f) was instructive because it described Commerce's current practice and policy); Certain Pasta From Italy, 61 Fed. Reg. 30,326, 30,352 (Dep't Commerce, June 14, 1996)(final determination)("While consistent with our practice on this issue, section 351.401(f) of the Department's proposed regulations give a new articulation to the collapsing test."). Therefore, Commerce was aware of the proposed regulation when it addressed MAN Roland's request to collapse on July 23, 1996.

In this context, the language of 19 C.F.R. § 351.401(f) contradicts the practice Commerce here asserts. Commerce claims that it will only average a respondent's production costs incurred at multiple facilities where the facilities produce identical products. See Redetermination at 8. The regulation, however, expressly states that Commerce will collapse (i.e., calculate a single weighted-average dumping margin for) two affiliated producers where "those producers have production facilities for similar or identical products[.]" 19 C.F.R. § 351.401(f)(emphasis added); see also Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,330 (Dep't Commerce, Feb. 27, 1996)(proposed rules)("[I]n rare situations the Department may conclude that a product that is not subject merchandise or a foreign like product is sufficiently similar to subject merchandise that the producers of those products may be candidates for collapsing.").

The regulation also undermines Commerce's assertion that "the Department does not weight-average the production costs incurred

for non-identical merchandise simply because the respondent <u>could</u>
have produced identical merchandise" at more than one facility.
Redetermination at 8.   Under the regulation, the presence of a
"significant <u>potential</u> for the manipulation of price <u>or production</u>"
is central to the decision of whether to collapse in the first
place.   19 C.F.R. § 351.401(f)(emphasis added).[5]

The Court recognizes that "substantial deference [is] accorded
to Commerce when interpreting and applying its own regulations[.]"
<u>Torrington Co. v. United States</u>, 156 F.3d 1361, 1363 (Fed. Cir.
1998).   Here, however, Commerce's application of the identical
merchandise requirement is inconsistent with 19 C.F.R. § 351.401
and contrary to Commerce's collapsing practice.[6]

---

[5]Commerce cited 19 C.F.R. § 351.401(f) in its
redetermination, arguing that even where Commerce collapses two
affiliated companies, it may properly decide not to weight-
average the companies' production costs where the products
manufactured by each are not identical.  <u>See</u> Redetermination at
4-5.  While it is certainly within Commerce's authority to make
fact specific determinations, Commerce cannot do so in a way that
is inconsistent with the regulation.

[6]Commerce argues that, even if the identical merchandise
requirement is not its established practice, the Court should
sustain it because the practice is reasonable, and Commerce gave
the affected parties an opportunity to comment.  <u>See</u> Def.'s
Response to MAN Roland's Cmts. at 11 (citing <u>Usinor Sacilor v.
United States</u>, 19 CIT 711, 742, 893 F. Supp. 1112, 1139 (1995),
<u>appeal docketed</u>, No. 98-1269 (Fed. Cir. Feb. 13, 1998)).
"Commerce has the flexibility to change its position providing
that it explains the basis for its change and providing that the
explanation is in accordance with law and supported by
substantial evidence." <u>Cultivos Miramonte S.A. v. United States</u>,
21 CIT ___, ___, 980 F. Supp. 1268, 1274 (1997).  Here, however,
it is inconsistent for Commerce to argue that the identical
merchandise requirement is both an established practice and a new
practice.  Moreover, the identical merchandise requirement is not
consistent with Commerce's collapsing practice as it existed
after, as well as before, the determination in <u>Germany Final</u>.

**C. Conclusion**

Commerce has not demonstrated that the identical merchandise requirement is its established practice in the context of affiliated parties. Moreover, the only context in which the discussion of whether to average the production costs of affiliated parties does occur is in the context of collapsing. Here, Commerce never addressed the threshold question of whether MAN Roland and MAN Plamag should be collapsed. Therefore, to properly determine whether MAN Roland's and MAN Plamag's production costs should be averaged, Commerce should apply its collapsing practice as it then existed and was later codified at 19 C.F.R. § 351.401(f). Commerce has not made the required finding. Therefore, the Court remands the matter for a determination consistent with this Court's opinion.

**II. Recalculating MAN Roland's SG&A Expenses**

In the underlying decision, this Court remanded the matter to Commerce to recalculate MAN Roland's selling, general, and administrative ("SG&A") costs using an appropriate allocation ratio. See Koenig & Bauer-Albert, 22 CIT at ___, 15 F. Supp.2d at 855.

---

See, e.g., Stainless Steel Wire Rod From Sweden, 63 Fed. Reg. 40,449, 40,453 (Dep't Commerce, July 29, 1998)(final determination); Gray Portland Cement and Clinker From Mexico, 62 Fed. Reg. 47,626, 47,626-627 (Dep't Commerce, Sept. 10, 1997)(preliminary results of admin. review). Thus, it is not apparent that Commerce changed its practice at the time of its determination in Germany Final.

In calculating constructed value for MAN Roland's home market sales, Commerce rejected MAN Roland's submitted cost figures and relied instead on cost estimates prepared by MAN Roland prior to the initiation of the instant investigation.  See id. at ___, 15 F. Supp.2d at 854.  To isolate the SG&A costs attributable to each LNPP project, Commerce multiplied the total cost of production for each product by an SG&A ratio, which was equal to the total SG&A costs for all projects divided by the total cost of production for all projects.  See id.

Inadvertently, however, Commerce used a somewhat inaccurate allocation ratio.  See id.  The denominator of the SG&A ratio did not include the cost of purchased parts worth more than DM 500 while the cost of production to which the ratio was applied included the cost of purchased parts worth more than DM 500.  See id.  Therefore, the resulting SG&A amounts were inflated.  See id.

On remand, Commerce corrected the error by multiplying MAN Roland's SG&A ratio by the total estimated cost of manufacturing, exclusive of the value of purchased parts costing more than DM 500. See Redetermination at 10.  Thus, the allocation ratio used on remand is reasonable because the SG&A ratio was determined on the same basis as the figures to which it was applied.

Commerce followed this Court's instructions in recalculating MAN Roland's SG&A expenses, and its methodology was reasonable. Moreover, MAN Roland concedes that the recalculation of SG&A was

"reasonable[.]"   MAN Roland Cmts. at 9.[7]   Therefore, the Court sustains Commerce's recalculation of MAN Roland's SG&A expenses.

## Conclusion

For the reasons set out above, Commerce's redetermination in Large Newspaper Printing Presses from Germany is remanded for reconsideration and explanation consistent with this Court's opinion.   Commerce shall complete its remand determination by Monday, May 17, 1999; any comments or responses are due by Wednesday, June 16, 1999; and any rebuttal comments are due by Thursday, July 1, 1999.

So Ordered.

 
                                        _____
                                        Donald C. Pogue
                                        Judge


Dated:     March 16, 1999
           New York, New York

---

[7]MAN Roland argues, however, that, even though Commerce's SG&A calculation method on remand may be reasonable, "it certainly is not the only reasonable method, and it may not be the most accurate."  MAN Roland Cmts. at 9.  "'As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, [however,] and there is substantial evidence in the record supporting the agency's conclusions, the court will not . . . question the agency's methodology.'"  Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 450, 773 F. Supp. 1549, 1553 (1991)(quoting Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-405, 636 F. Supp. 961, 966 (1986), aff'd, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987)).